THE FRONTIER BANK *versus* SAMUEL A. MORSE.

Where bills of a bank, which was in good credit at that time in that place, were received in exchange for other bills, when in fact the bank had previously failed, but the failure was unknown to both parties, and each supposed the bills to be current, the loss on the bills is to be borne by the payer, and not by the receiver.

The rule that where both parties are equally innocent or equally guilty, *potior est conditio defendentis,* does not apply to cases of money paid by mistake.

Where bills are thus received as currency, when the bank had failed, it is not necessary that the receiver should present the bills at the bank for payment. It is sufficient, if the payer was seasonably notified of the failure, and that the amount would be required of him, and that the bills, which had been sent to the place where the bank issuing them was located, would be returned to him as soon as practicable.

And if the payer of the bills is seasonably notified, and replies, that he will have nothing to do with the bills, it is not necessary that they should be returned by the earliest mail, or tendered to him.

THE action was assumpsit on the common money counts, and was brought to recover of the defendant the amount of

two bills of one hundred dollars each, of the Commonwealth Bank, Boston, exchanged by the defendant with the plaintiffs on the 12th day of January, 1838, after the failure of the Commonwealth Bank.

The plaintiffs introduced the deposition of Edward Ilsley, their cashier, from which it appeared that the exchange was made at his request, he being desirous of obtaining bills of a large denomination to remit to Boston; that he gave the defendant therefor bills of a small denomination on banks within the United States at that time current in Boston and which the defendant on the next day deposited in the Frontier Bank; that the defendant at that time had a deposit in said bank; and that at the time of the exchange, there was no agreement as to the responsibility of the Commonwealth Bank.

It further appeared that the bills of the Commonwealth Bank were sent to the New England Bank by the deponent on the 13th day of January, 1838, by mail. That on the 16th day of said month, having heard of the failure of the Commonwealth Bank, he immediately called on the defendant, and notified him of that fact; that said bills had been sent to the New England Bank, and that he should return them to him; and that the defendant replied, that he should have nothing to do with them; that if said bills had been immediately returned from Boston by mail, they would have been received in Eastport by the 21st or 22d of January, 1838; that they were returned by a packet regularly plying between Boston and Eastport, and were in fact received in Eastport on the 21st day of February, 1838, and on the same day, or within a day or two, were by the deponent tendered to the defendant, who declined to have any thing to do with them.

The plaintiffs also offered the deposition of Philip Marett, President of the New England Bank, who testified that said bills were received by him in Boston in a letter from the cashier of the Frontier Bank, dated January 13th, 1838, and that on the 17th of said month he acknowledged their receipt and informed the said cashier of the failure of the Commonwealth Bank; that at the time said bills were received it was perfectly notorious

that said bank did not redeem its bills, and that he did not present said bills to said bank.

The defendant introduced the deposition of Ebenezer Smith, Jr. who testified that in December, 1837, he sent to the defendant a large amount of Commonwealth Bank bills of one hundred dollars each, together with some bills of other banks, and informed him that the Commonwealth bills were the best of all that were sent; that after the failure of that bank he communicated that fact to the defendant, and that shortly after the defendant returned to him five hundred dollars of said bills for which he paid the defendant specie to the full amount with interest from the time of the failure; that if the defendant had sent a larger amount, he should have redeemed to the extent of his means, and could have paid five hundred dollars more; that the reason of his paying specie for said bills, was that they had been sent to the defendant through the deponent's instrumentality and had been kept by the defendant through his strong recommendation.

The said bills were by arrangement of the parties sold in Boston in Dec. 1838, for sixty-nine per cent.

The plaintiffs attempted to prove, that the bills were received by them after, and the defendant before the failure of the bank; and the jury were directed by SHEPLEY J. then holding the Court, to find for the plaintiffs, if satisfied the exchange took place after the failure of the bank; and to find for the defendant, if the exchange took place before the failure. The jury found a verdict for the plaintiffs, which was to be set aside and a nonsuit entered, or judgment to be entered for plaintiffs for the amount of the loss on the bills, according to the legal rights of the parties on these facts.

This case was fully and ably argued in writing, but the arguments are too much extended for publication. Some of the positions taken, only will be given, with authorities cited in their support.

*J. A. Lowell* and *S. S. Rawson*, for the defendant.

1. The bills in controversy having been received by the cashier of the Frontier Bank in exchange for other bank bills,

not in payment of a pre-existing debt, but for the express ac-
commodation of the bank ; and at the time of the exchange
the bills being current at Eastport, neither party having any
knowledge of the failure of the Commonwealth Bank, or reas-
on to apprehend that it had failed, and both parties being
equally innocent ; the defendant is not liable for the loss, and
this action cannot be maintained.

It is a well settled and universal rule of law, that where the
parties are equally innocent, or equally guilty, *" melior est con-
ditio defendentis,"* and no action can be maintained by either
party. 1 Mass. R. 66 ; 6 Mass. R. 182, 321 ; 3 Burr. 1354 ;
Dougl. 654 ; 2 East, 314 ; 2 Caines, 48 ; 2 Johns. R. 235 ;
1 B. & P. 260 ; 17 Mass. R. 1, 33.

Bank bills being a part of the currency of the country, and
universally considered and treated as money, the person who
holds them at the time the failure of the bank *becomes known,*
must suffer the loss ; unless he had been fraudulently imposed
upon by some person who had obtained prior information of its
failure. 6 Mass. R. 182 ; 1 Burr. 457 ; 3 T. R. 554 ; 9
Johns. R. 120 ; 19 Johns. R. 144 ; 5 Cowen, 186 ; 4 Cowen,
420 ; 1 Hammond, 178 ; 6 Har. & J. 47 ; 10 Wheat. 347 ;
12 Johns. R. 220, 395 ; 1 Johns. C. R. 238 ; 5 Taunt. 488 ;
1 Marshall, 157 ; 2 Ves. Jr. 120 ; 3 Atk. 232 ; 6 Cowen,
468 ; 8 Yerger, 175 ; 4 Dallas, 345 ; 1 Bin. 27 ; 10 Verm.
R. 141 ; *Bayard* v. *Shunk*, decided in the Supreme Court in
Pennsylvania, and found in the Law Reporter, Vol. 4, 214.
These cases were commented upon, and considered, especially
the last, as conclusive for the defendant.

By the English common law, recognized in Maine, Massa-
chusetts, and most of the other States, and by our U. S.
Courts, the receipt of a bill or note from the debtor of a third
person for goods sold is regarded as payment. 6 Mass. R.
321 ; 11 Johns. R. 414 ; 17 Mass. R. 1, 33 ; 3 Cranch, 311 ;
6 Cranch, 253 ; 1 Mason, 192.

It was the original intention of the defendant to sell, and
of the plaintiffs to buy the hundred dollar bills in controversy,
and to make payment in bills of a small denomination. The

defendant has fulfilled his contract, and the plaintiffs cannot maintain this action.

2. It was the duty of the plaintiffs to present the bills to the Commonwealth Bank for payment; and the reputed failure of that bank to redeem its bills in specie, did not excuse the performance of that duty. The bills were depreciated, but not worthless. 18 Johns. R. 341; 14 East, 498; 2 Taunt. 60; 3 Taunt. 397; 16 East, 108.

3. It was the duty of the plaintiffs to have returned the bills to the defendant, as soon as they could have been transmitted from Boston to Eastport in the ordinary course of the mails; and the neglect to do so from the 17th of January to the 21st of February was an unreasonable delay and neglect, prejudicial to the interests and rights of the defendant, which discharged him from liability, if it would otherwise have existed.

It is respectfully, but earnestly and confidently contended, that there is no principle either of law, justice, or equity, on which this suit can be maintained; and the defendant compelled to suffer a loss sustained by the plaintiffs through their own act, in effecting an exchange of bills for their own accommodation; or their own neglect in presenting the bills for payment; and if not paid, returning them forthwith to the defendant.

*D. T. Granger*, for the plaintiffs.

The principle which lies at the foundation of the plaintiffs' case is this. When one passes to another bank bills as money, and at the time, the bank which issued the bills has in fact failed, the loss shall fall on the party paying the bills, where both parties acted in good faith, in ignorance of the failure. This has been settled as a principle of law by several cases which the Court will recognize as authority; and if it is regarded as a question depending merely on decided cases the weight of authority seems altogether with the plaintiffs. *Moses* v. *Gridley*, decided recently in the Supreme Court of Ohio; *Fogg* v. *Sawyer*, by the Supreme Court in New Hampshire; *Lightbody* v. *Ontario Bank*, 11 Wend. 9, and

in the Court of Errors, 13 Wend. 101; 2 Hill, (S. C.) 509; 11 Vermont R. 516; ib. 576; 1 J. J. Marsh. 523; ib. 503.

While it will not be denied, that under some circumstances, and for some purposes, bank bills are regarded as money, it is on all hands conceded, that they are invested with this character, not by force of any enactment, but by the common consent of the community, by a conventional law. There is a point however when they lose this character, and become either so many pieces of worthless paper, or mere articles of bargain and sale. And the plaintiffs say, that bank bills are to be regarded as money so long, only, as the bank issuing them continues, in good credit, to conduct its ordinary business; and that they cease to be as money when the bank fails.

The object is, or should be, to fix on some rule that can be easily applied, and which shall be uniform at all times and in all places. Now this, the failure of the bank, seems to be just such a rule.

The extent of the conventional law which impresses bank bills with the character of money would seem to present a question of fact. If so, it has been decided by the jury in favor of the plaintiffs.

It is said by the defendants, that if the plaintiffs are right in their principle as applied to the case of a pre-existing debt, that it becomes inapplicable here, because this was an exchange. It is believed, that the distinction thus set up is entirely illusory. The only difference between the cases is one of time; payment at the moment or at a subsequent period. Two of the cases cited, 11th Vermont R. 516, and the New Hampshire case, were cases of the purchase of goods and payment at the time; and the New York case, *Lightbody* v. *Ontario Bank*, covers the whole ground.

We are met with another objection, that it was the duty of the plaintiffs to present these bills for payment forthwith, and upon their non-payment, to have tendered them to the defendant, as soon as by the ordinary course of mail they could be returned to Eastport.

The correctness of this position is denied. The rules in

regard to the presentment of notes and bills of exchange have no applicability to the present case; and in none of the cases cited was there a presentment of the bills for payment to the banks that had failed. But in fact, there was an extraordinary degree of diligence on the part of the plaintiffs. The bills were received on the afternoon of Jan. 12, and sent to Boston by the mail of the next day; and on the 16th they received notice of the failure of the Commonwealth Bank, and gave notice thereof to the defendant. No tender of the bills was necessary. *Cambridge* v. *Allenby*, 6 B. & Cr. 373, (13 Eng. Com. L. R. 202.) But if a tender was necessary, it is enough, that it was made within a reasonable time. It was made immediately on the return of the bills from Boston in the ordinary mode. What is a reasonable time is a question of law for the decision of the Court, to be determined on a view of the circumstances of the case. 1 Metc. 172, 369. But if a tender at an earlier day would have been necessary under other circumstances, it was wholly excused in this case by the unqualified refusals of the defendant to have any thing to do with the bills. He has waived all pretence of right to have the bills actually offered to him. 16 Maine R. 407 ; 2 Car. & P. 77 ; 7 Johns. R. 476.

We believe this action to be maintainable upon the broad principles of equity and moral honesty. It was supposed by both parties at the time of the transaction, that the bills of the Commonwealth Bank, were current in Boston at par. That was the very gist of the contract. Had the fact of the failure of the Bank been known or suspected, the bills would not have been received by the plaintiffs. The parties acted under a mistake of a very material fact, a fact that strikes at the vitals of the contract. *Norton* v. *Marden*, 15 Maine R. 45 ; 3 Wend. 412.

The rule that where the parties are equally innocent, "*potior est conditio defendentis*," cannot aid the defendant. It does not apply to any transaction founded on a mutual mistake of the facts. And yet the cases are abundant to show that such mistakes may be rectified. It is believed that the

cases relied on for the defendant are those cases where it was well understood by the parties, at the time, that a risk was to be incurred, and each party was to take his chance.

The opinion of the Court was drawn up by

WHITMAN C. J. — It is a well established principle of law, that, if money be wrongfully paid under a mistake of the facts it may be recovered back, in an action for money had and received; it being considered unconscionable, that money, so paid, should be detained from the payer. That the case here presented for our consideration is of that class seems incontrovertible. The plaintiffs were desirous of obtaining from the defendant that, which could be regarded as in the nature of money, with which to pay a debt due, where nothing but that, which was regarded as tantamount to the lawful currency, would be accepted in satisfaction. The plaintiffs delivered to the defendant the bills of banks of that description. In consideration thereof the defendant delivered to them an equal amount of bank bills, believed by both parties to be what the plaintiffs were known to be in pursuit of, but which, unfortunately, the day before, had, in fact, ceased to be current as money; and had become mere merchandize, capable, as the case shows, of being sold at only sixty-nine per centum of its nominal value. The question now is, who shall bear the loss of the residue.

The defendant contends, that he was the innocent vendor of the bills, at the request of the plaintiffs, and for their accommodation; and at what was then, at the place where they were sold, their current value; likening it to the traffic in merchandize, in which the principle of *caveat emptor* take place. And his counsel have argued ingeniously, and cited numerous authorities in support of his positions. On the other hand many cases are cited, and urged with great force upon our attention, supposed to be of an opposite tendency.

The case relied upon by the defendant, as most directly in point, is to be found in the Law Reporter, Vol. 4, p. 214, purporting to be a decision by the Supreme Court of Pennsylvania,

in which it would seem to have been held, that "a *bona fide* payment of the notes of a broken bank discharges the debt." Mr. Chief Justice Gibson, in that case, as reported, would seem to have deemed it proper to go into an elaborate course of reasoning to sustain the decision. And well he might, for two important reasons: first — because the Supreme Court of the State of New York, and the court for the correction of errors of the same State, had decided otherwise,—*Lightbody* v. *The Ontario Bank,* 11 & 13 Wend.; — and secondly — because, independently of any adverse decision, he was probably aware, that doubts might be entertained of its soundness. And moreover, he has found it necessary to urge, to quote his own language, that "the civil law principles of equity, however practicable in an age, when the operations of commerce were simple, slow and deliberate, would be utterly unfit for the rapid transactions of modern times."

It may be admitted, that there is some difficulty in extracting from the decisions in analogous cases, which are not, at all points, in perfect harmony with each other, the rule which ought to be applied in such cases. The New York rule is unquestionably more conformable, "to the civil law principles of equity." If not, however, in correspondence with the principles of the common law we should not be at liberty to adopt it. And if it be inapplicable to the state of things in this commercial age, as the common law is founded on principles of practical utility, we might well hesitate before yielding to it our sanction as a rule of action. But we are very much inclined to consider equity and utility, in reference to rules of action, as nearly, if not quite, synonymous terms. That which is not equitable is not just, and that which is not just ought not to be law, and can scarcely be of practical utility.

The Chief Justice seems to entertain great veneration for the principles of the common law, and in this we fully concur with him. And without intending to make any invidious comparisons between the decisions of the Courts of Pennsylvania and New York, in this particular, we are free to confess, that we entertain great respect for the decisions of the Supreme

Court of the latter State; and, especially, when accompanied by the almost unanimous concurrence of their court for the correction of errors. The fountains of the venerated common law are no where in *America* more copiously drawn upon for the correct rule of decision than in that State.

To fortify his decision the Chief Justice relies mainly upon the dictum of Lord Mansfield, in *Miller* v. *Race*, 1 Burr. 452, that bank notes are treated as money, " as much so as guineas themselves," which no one at this day will question, so long as banks maintain their credit, and it cannot be believed that Lord Mansfield had reference to bills of banks of any other description; and upon the cases of *Cambridge* v. *Allenby*, 6 B. & C. 373; and *Young* v. *Adams*, 6 Mass. R. 182.

In the case of *Cambridge* v. *Allenby*, the vendor of goods had received in payment the notes of a banking house, which had, a few hours before, stopped payment, neither party, at the time, having any knowledge of it. The vendor kept the notes seven days without demanding payment of the bankers, or giving notice to the vendee to receive them back. The Court held, that by this delay, the vendor had made the notes his own. It is true that the Judges do remark, in giving their opinions, that, if the notes had been received as cash, the plaintiff must also have failed; but this was not the ground of their decision. And it is believed that there is no English decision to be found directly to that effect.

In the case of *Young* v. *Adams* the decision was, that payment made in a counterfeit bill was a nullity; and that the amount of it was recoverable in an action for money had and received. Nothing more was decided in that case. The residue of the opinion of the Court, drawn up by Mr. Justice Sewall, contains some loose *obiter dicta*, in a style somewhat obscure, from which it would seem, the Chief Justice must have gathered, what he denominates, as *tending* to support his conclusion, the " decree of the Supreme Court of Massachusetts." No decision of that Court can be found directly in support of any such doctrine. We think that neither the principles of the common law or of common honesty should

uphold it.   And we do not believe that there is to be apprehended any embarrassment " to the rapid transactions of modern times" from the adoption of the opposite doctrine.

Our numerous banks, of small capitals, or of almost no capital, issuing and pressing into circulation their notes, and gaining for them in numerous instances an ephemeral credit and currency, cannot be considered as cash, if at all, longer than their credit is maintained.   To hold otherwise would open a door to frauds innumerable.   The holder of the notes of a broken bank, living in its vicinity, would be tempted to hasten into remote and obscure places; and before the news of the discredit of the bills had reached there, pass them off to the simple and unwary, who would be utterly unable to prove knowledge of their discredit on the part of him, who had passed them off; and be therefore compelled to pocket the loss; whereas if the loss is made to fall upon him, in whose hands they might happen to be, at the time of the failure, no such result could happen. ·

Mr. Chief Justice Savage, in delivering the opinion of the Court, in *Lightbody v. Ontario Bank,* recognizes one rule, which we think cannot be questioned.   It is, that, what can be ascertained to have been the intention of the parties, as to the import of their contracts, shall be conclusive upon them. If it could be inferred, from what took place between the parties, that the party accepting bank bills in payment or exchange was to run the risk of their genuineness and value, he should be required to abide. by the consequences.   But. if it should be apparent, from the nature of the transaction or otherwise, that no such risk was in the contemplation of the parties, a different result should follow.   If goods were offered for cash, and the buyer should take them with a full understanding, that he was to pay cash for them, and, in making payment, should, inadvertently, pay for them, in what had the semblance of cash, but which was not, in effect, its equivalent, nothing would seem to be more reasonable than that he should make good the payment.

In the negotiation between the parties, in the case at bar, there does not seem to be any difficulty in ascertaining what must have been the understanding between them. On the one hand the plaintiffs wanted to avail themselves of that, which was, at the moment, equivalent to cash, and convenient for remittance by mail. Of this there is no reason to doubt, that the defendant was fully aware. The plaintiffs had an equivalent to offer him for it in bills of small denominations, not convenient for remittance by mail, which he accepted. At the time of making the exchange the defendant had, what, to a reasonable intent, he supposed was cash, and precisely that which the plaintiffs wanted, and passed it off to them accordingly. It does not seem that there could have been any misunderstanding as to the real intention of the parties. It was, however, afterwards discovered, that what the defendant let the plaintiffs have was not what he intended, nor what he well knew they expected they had received from him. What shall the defendant be holden to do in such case ? Certainly to reimburse the plaintiffs the amount of the loss originating from the disappointment. In doing so he would but conform to what must be believed to have been the intention of the parties.

As to the rule, that, where both parties are equally innocent or equally guilty, *potior est conditio defendentis,* it can no more apply to this case than to every other case of money wrongfully paid by mistake. Both parties, in all such cases, are, or may be presumed to be, equally innocent, yet no such objection to a recovery could be interposed.

This simple, and to us seemingly obvious view of the transaction, between these parties, will supersede the necessity of going into a review of all the numerous cases cited by the counsel for the parties, and in their elaborate arguments, urged upon our attention.

The defendant, however, contends, that the plaintiff should have presented the bills in question to the bank, from which they had been issued, for payment. The answer to this is, that they were not received for any such purpose. The plain-

tiffs received them as currency, and to be paid as such. Not finding they would answer any such purpose the defendant was notified, as soon as was practicable, of their inefficiency; and that the bills would be returned to him as soon as practicable.

The defendant further objects, that they should have been returned to him by the return of the mail, after they had been received at Boston, or as soon as practicable by mail; and that the plaintiffs should not have delayed their offer to return the bills, by waiting for their return by private conveyance from Boston. But it appears that he was notified by the plaintiffs of the failure of the bank, which had issued the bills, as soon as it became known to them, which was on the third day after they were remitted.to Boston, and that he would be looked to for reimbursement; and that he replied, he would have nothing to do with the bills. After this it would not seem reasonable, that he should complain, that the bills were not returned to him in due season. And a similar reply might be made to his allegation, that, if the bills had been seasonably returned to him, he could have obtained specie for them of the person, who remitted them to him. After the defendant had declared, in peremptory terms, that he would have nothing to do with the bills, the plaintiffs were surely excusable in not taking the trouble to tender them to him.

Judgment on the verdict.